FILED

2015 Sep-22  AM 11:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JESSE HUNT,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:14-cv-1626-JHH** |
| **ALTEC INDUSTRIES, INC.** | ) | |
| **DEFENDANT.** | ) | |

## MEMORANDUM OF DECISION

The court has before it Defendant Altec Industries, Inc.'s July 27, 2015 Motion (Doc. # 13) for Summary Judgment.  Pursuant to the court's July 28, 2015 order (Doc. # 16), the Motion was deemed submitted, without oral argument, on September 1, 2015. After careful consideration of the briefs and evidence before the court, the Motion (Doc. #13) for Summary Judgment is due to be granted for the following reasons.

## I. Procedural History

Plaintiff commenced this action on August 21, 2014 by filing a Complaint (Doc. #1) in this court alleging violations of the Family and Medical Leave Act (FMLA), 29 U.S.C. §2601 et seq.  Specifically, Plaintiff contends that "[i]n terminating Plaintiff, Defendant violated his rights under the FMLA by (a)

1

interfering with his right to take leave covered by the FMLA and/or (b) retaliating against him for availing himself of rights under the FMLA. (Compl. ¶ 59.) Defendants' Motion for Summary Judgment asserts that Plaintiff has failed to present evidence from which a reasonable jury could conclude that Defendants violated the FMLA.

Both parties have filed briefs and submitted evidence in support of their respective positions. Defendant submitted a brief (Doc. # 14) and evidence[1] (Doc. # 15) in support of their own motion for summary judgment on July 28, 2015. On August 25, 2015, Plaintiff filed a brief and evidence[2] (Doc. # 17) in opposition to Defendants' Motion for Summary Judgment. Plaintiff also filed a motion (Doc. # 17) to strike the affidavit of Amy Kelly and the attached exhibits. On September 15, 2015, the court determined that the affidavit and its exhibits were admissible and denied Plaintiff's motion to strike. (Doc. # 28) On September 1, 2015, Defendant filed a brief (Doc. # 23) in reply to Plaintiff's opposition. Defendant also filed an unopposed motion (Doc. #22) to supplement its evidentiary

---

[1] Defendants submitted the following evidence in support of summary judgment: deposition of Jesse Hunt and deposition exhibits 1, 3,-6, 8-11; deposition of Natalie Jennings and deposition exhibits 1, 5, 13, 16; deposition of Randy Mason; affidavit of Randy Mason; deposition of Emily Hunt; deposition of Stacia Gaines; affidavits of Rocky Jordan; affidavit of Michael Smith with exhibit; and affidavit of Amy Kelly with exhibits.

[2] Plaintiff submitted the following evidence in opposition to summary judgment: declaration of Jesse Hunt; declaration of Emily Hunt; Exhibit 14 to Natalie Jennings' deposition.

submission[3] in support of summary judgment.  The court granted that motion on September 3, 2015.  (Doc. # 24.)

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor

---

3 Defendant submitted exhibits 4 and 6 of Natalie Jennings' deposition.

of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249. The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party

4

must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

**III. Relevant Undisputed Facts**[4]

Defendant Altec manufactures specialty automotive bodies and other part for utility, telecommunications, vegetation management and similar markets.  (Compl. ¶ 4.) Plaintiff Jesse Hunt was hired by Altec on August 10, 2010 to work at its Southern Plant in Birmingham, Alabama.  (Hunt Dep. at 16.)  Hunt's position at Altec was that of a body painter.  (Compl. ¶7.)

**A.  Altec's Policies and Procedures**[5]

**1.  Attendance and Vacation Policies**

Under Altec's Attendance Policy, if an employee is unable to be at work for any reasons, the employee is required to call the Human Resources Department. (Exh. 3 to Hunt Dep.)  The employee is instructed to leave a voice mail informing Human Resources that he will not be at work that day.  (Id.; Hunt Dep. at 25.)

Per the Union contract, Altec employees accrue vacation time based on the years of service.   (Exh. 1 to Hunt Dep.)   Typically, vacation days must be scheduled and receive prior approval, but under specific circumstances, an employee can take a vacation day without prior approval by "calling in" a vacation

---

[4] If the facts are in dispute, they are stated in a manner most favorable to the non-movant. See Fitzpatrick, 2 F.3d at 1115.

[5] Despite Hunt's self-serving assertions to the contrary, the evidence establishes that Hunt had access to and knowledge of Altec's various policies.  Specifically, he had access to and knowledge of Altec's website that housed all personnel policies.  (Jennings Dep. at 47-48; Exh. 6 to Jennings Dep.)  On October 28, 2013, Hunt logged on to the website and acknowledged his receipt and review of Altec's Associate Handbook which includes the Leave of Absence policy. (Id.)

day.  (Id.)  Altec employees are limited to a total of four accrued vacation days per year as "call in", but they may only use one "call in" vacation day per month.  (Id.)

Altec uses a point system method to manage and implement its Attendance Policy.  The Attendance Policy states that "[p]oints will be given to an associate for absences, trades, left early, no-reports, and other situations if the associate is not at work when scheduled.  Points will be accumulated on a 12-month rolling period."  (Id.)  Points are not given, however, for absences associated with "Bona Fide Approved FMLA."  (Id.)   The Attendance Policy establishes a progressive disciplinary procedure for point accumulation.  (Id.)  An associate's accumulation of eight (8) points results in a final reprimand, and the accumulation of nine (9) points results in termination.  (Id.)

Altec's Vacation Policy is governed by the union contract.  (Id.)   The Vacation Policy provides for the accrual of vacation time based on years of service.  (Id.) There are also rules related to the use of accrued vacation time:

> Associates will be limited to utilizing four (4) accrued vacation days as "call in."  That is, associates may receive a day of vacation, provided the associate has vacation available, without having been previously approved and scheduled.  Associates are limited to only one (1) call in vacation day during any calendar month.  Under no circumstances will associates be eligible for more than four (4) days of "call in" vacation during a calendar year.

(Id.)

7

### 2.  Leave of Absence and The Hartford

Altec's Leave of Absence policy details the various types of available leave and the requirements for each type of leave, including leave under the FMLA. (Exh. 1 to Jennings Dep.)  Altec's leave policy is administered by a third-party vendor, The Hartford.  (Jennings Dep. at 23.)  As a result, Altec employees must contact The Hartford when they need to request a leave of absence. (Id. at 52.) Instructions for contacting The Hartford are posted on the lunchroom bulletin board.  (Id. at 49, 61, 65; Exh. 5 to Jennings Dep.)  Employees are required to follow the outlined process to be approved for FMLA leave.  (Jennings Dep. at 75.)

The Hartford gathers all appropriate information and documentation from employees requesting leave, makes the eligibility determinations, and approves or denied an employee's request for leave, "based on the eligibility file data."[6]  (Kelly Aff. ¶ 4; Exh. A to Kelley Aff.; Gaines Dep. at 12.)  After The Hartford has made a decision regarding a specific leave request, it sends an email to Altec's Human Resources Department regarding the status of the request.[7]  (Jennings Dep. at 55.) If the request is approved, The Hartford provides Altec with the time frame for which the leave is approved.  (Id.)

---

6 The Hartford receives eligibility data from Altec each Friday as part of an automated, secure transfer from Altec's server to The Hartford's server.  (Kelly Aff. ¶ 5.)

7 Altec does not determine whether an employee is eligible for FMLA leave or whether a leave request will be approved.  (Gaines Dep. at 12.)

## B. Hunt's Attendance

In February 2014, Hunt informed Natalie Jennings, Human Resource Generalist, that his wife was expecting a child and he would need to take some time off work.  (Id. at 40.)  Hunt testified that Jennings told him that once his wife went into labor, he should use the company's call-in line and report that he was taking off for the birth of his child.  (Hunt Dep. at 33, 42, 49.)[8]   At some point after this conversation,[9] Hunt believed that his regular, accrued vacation days (not call-in vacation days) would be used for leave related to the birth of his son.  (Id. at 48-49.)

On February 5, 2014, Hunt's wife was taken to the emergency room for pregnancy-related issues and she stayed overnight.  (Id. at 45-46.)  The next day, February 6, 2014, Hunt called in and requested to take a vacation day.  (Hunt Dep. at 45-46.)  He did not state a reason for his absence.[10]  (Id. at 46.)  This vacation

---

8 Jennings testimony regarding this conversation is vastly different from Hunt's.  She testified that she reminded Hunt of Altec's leave policies and that he needed to call The Hartford to report that he wanted time off for the birth of his son.  (Jennings Dep. at 61.)  Jennings testified that she informed Hunt that his absences may be FMLA eligible and that he would have to provide the appropriate documentation to The Hartford to be approved for FMLA leave. (Jennings Dep. at 62.)  She further testified that she directed Hunt to the bulletin board where the leave policy was posted and told him that he would be required to use any available vacation time while on leave.  (Id.; see also E. Hunt Dep. at 12.)  Hunt denies that this conversation occurred. (Hunt Dep. at 40, 33-34, 51-52, 55; Hunt Decl. ¶¶ 3, 5.)

9 Hunt testified that Jennings did not tell him he would have to use vacation days for the days missed related to the birth of his child at this initial meeting in February, and it is unclear when he gained this understanding.  However, at some point before the birth of his child, Hunt testified that he was told that the days missed for the birth of his child would be regular vacation days (as opposed to call-in vacation days).  (Hunt Dep. at 41, 48-49.)

10 Hunt testified that his wife was taken to the emergency room on February 5, 2014 and

day was Hunt's second call-in vacation day for the year 2014.  (Id. at 44-46; Exh. 6 to Hunt Dep.)

One month later, on March 5, 2014, Hunt's wife was admitted to the hospital for monitoring and possible induction.  (Hunt Decl. ¶ 4.)  Hunt called in to request a vacation day.  (Hunt Dep. at 46-47.)  He did not report this absence as being related to the birth of his son.  (Id.)  This vacation day was Hunt's third call-in vacation day for the year 2014.  (Exh. 6 to Hunt Dep.)  It was his first call-in vacation day for the month of March.  (Id.)

The next day, on March 6, 2014, Hunt's son was born, and he was again absent for work.  (Hunt Dep. at 47.)  Hunt testified that he called in and left a voicemail stating that he "was calling in for the birth of [his] son."  (Id.)  It was his second call-in vacation day for the month of March.  Hunt was given an attendance point under Altec's policy for this call-in day.  (Exh. 6 and 11 to Hunt Dep.)  It was Hunt's fifth attendance point for the past 12 month period.  (Exh. 6 to Hunt Dep.)

Hunt was also absent from work on March 7, 10 and 11, 2014.  On March 7, 2014, Hunt's wife was still in the hospital, and he called in and reported the absence as due to the birth of his child.  (Hunt Dep. at 48.)  It was his third call-in vacation day for the month, and Hunt was given his sixth attendance point for this

---

stayed over-night for pregnancy related issues. (Hunt Dep. at 45-46.)  He did not tell anyone at Altec that this was the reason for his call-in vacation day.  Hunt testified that Jennings told him to report absences as due to the birth of his child only after he wife had gone into labor.  (Hunt Dep. at 47.)

call-in.  (Exhs. 6 & 11 to Hunt Dep.)  Hunt did not go to work on March 10 and 11 because his wife was on bed rest, and he had to stay home to take care of her and the baby.  (Hunt Dep. at 50-51.)  Hunt called in and reported the absences as due to the birth of his child.  (Id.)  Per Altec's policy, Hunt received his seventh and eighth attendance points for these call-in absences.  (Exhs. 6 & 11 to Hunt Dep.)

Hunt returned to work on March 12, 2014.  (Hunt Dep. at 51.)  Because Hunt had accumulated eight attendance points, Jennings and Hunt's supervisor, Randy Mason, met with Hunt on March 17, 2014 to issue a final reprimand in accordance with the attendance policy.  (Id. at 54; Exh. 8 to Hunt Dep.)  During that meeting Jennings explained to Hunt that he should call The Hartford and apply for FMLA leave if he wanted the absences that were related to the birth of his child to be covered under the FMLA policy.  (Hunt Dep. at 55; Jennings Dep. at 65; Mason Aff. ¶ 4.)  Jennings gave Hunt a brochure that explained how to apply for leave with The Hartford and explained that if he was approved for FMLA leave, the final reprimand would be removed from his file.  (Hunt Dep. at 56; Jennings Dep. at 66; Mason Dep. at 12.)  Jennings also explained that once Hunt was approved for FMLA leave, he would be required to use his accrued vacation time to cover the absences, and that once his vacation time was exhausted, any additional leave would be unpaid.  (Hunt Dep. at 57.)  At the end of the meeting, Hunt did not have any questions about the FMLA and he understood what Jennings

11

told him about the FMLA, including that he could apply for FMLA leave and avoid termination.  (Hunt Dep. at 69-70, 84.)

After this meeting, Hunt's wife called The Hartford, but she was told that The Hartford did not have Hunt in their records.  (E. Hunt Dep. at 17, 19-20, 22-23.)  Hunt later told Jennings that The Hartford did not have him in their system, and Jennings assured him that she would look into it.  (Hunt Dep. at 60; Jennings Dep. at 100.)   Hunt testified that Jennings said she would get back with him on this issue, but she never did.  (Hunt Decl. ¶ 5.)

At some point, Hunt also called The Hartford and was told he "was not on file."  (Hunt Dep. at 61.)  Hunt did not tell anyone at Altec that he contacted The Hartford, and no one at Altec told Hunt he was not in the system at The Hartford.  (Id.)

On March 20, 2014, Jennings emailed The Hartford Claims Customer Support to ask if there were any leaves open for Hunt.  (Exh. 16 to Jennings Dep.)  The Hartford representative responded that "No claim/leave has been initiated by Mr. Hunt" and attached a screen shot from her computer with a "Claim Status" inquiry for employee Jesse Hunt (with his social security number) that stated "[t]here are no claims or leave events for this employee."  (Exh. 16 to Jennings Dep.)  Jennings again contacted The Hartford on March 26, 2014, and was again informed that no claim/leave had been initiated by Hunt.  (Id.)

12

On April 5, 2014, Hunt's grandparents came into town to see his newborn child for the first time. (Hunt Dep. at 63.) Hunt called in to request a call-in vacation day and did not provide Altec with a reason for his absence. (Id. at 64.) As a result, Hunt received his ninth attendance point in accordance with Altec's attendance policy. (Exhs. 6 &11 to Hunt Dep.)

On April 28, 2014, Jennings and Mason met with Hunt and his union representative, Rocky Jordan. (Hunt Dep. at 64.) During that meeting, Hunt was told that he was being terminated for reaching nine attendance points. (Id.) Hunt was given a document showing the dates he missed work and the accumulation of the nine points, but he refused to sign it because he "did not agree with the points that were accumulated due to the birth of [his] son." (Id. at 65-69.) Hunt admitted, however, that he still had not been approved for FMLA leave at the time her was terminated. (Id. at 69.) Hunt testified that he had not been approved "[b]ecause they [The Hartford] did not have [him] on file for Altec." (Id.)

## IV. Applicable Substantive Law and Analysis

The FMLA holds an employer liable "who interferes with or denies any rights provided to an employee" under the FMLA, Wascura v. Carver, 169 F.3d 683, 685 (11th Cir.1999) (citing 29 U.S.C. § 2617(a)), or who "intentionally discriminates against him in the form of an adverse employment action for having exercised an FMLA right." Strickland v. Water Works & Sewer Bd. Of the City of

Birmingham, 239 F.3d 1199, 1207 (11th Cir. 2001).   The FMLA entitles eligible employees to 12 weeks of leave during any 12–month period for a serious health condition. 29 U.S.C. § 2612(a)(1)(D).   Following a period of FMLA leave, an employee has the right to be restored to his original position or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." Id. § 2614(a)(1). When an employee cannot perform an essential function of his original "position because of a physical or mental condition, including the continuation of a serious health condition," he "has no right to restoration to another position." Id. § 825.216(c). "An employee is 'unable to perform the functions of the position' where the health care provider finds that the employee is unable to work at all or is unable to perform any one of the essential functions of the employee's position." Id. § 825.123(a).

To protect an employee's rights, the FMLA created two types of claims – "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which the employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." Strickland, 239 F.3d at 1206.   Plaintiff brings both types of claims.   The court discusses each one separately below.

14

## A. Interference Claim

To establish an interference claim under the FMLA, "an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA." Martin v. Brevard Cnty. Pub.Sch., 543 F.3d 1261, 1266-67 (11th Cir. 2008); see also Wascura, 169 F.3d at 685.   Plaintiff contends that Defendant interfered with his rights under the FMLA when it terminated him based on absences that should have been covered by the FMLA.[11]   Defendant counters that Hunt "failed to avail himself of a protected right under the FMLA when he chose not to comply with Altec's usual and customary notice and procedure requirements for applying for FMLA leave, and his interference claim fails as he cannot demonstrate that he was denied any benefit to which he was entitled." (Doc. #14 at 16-7.)  The court agrees with Altec for the following reasons.

Regulations to the FMLA permit employers to condition leave under the FMLA upon an employee's compliance with the employer's usual notice and

_____

11 Hunt's arguments regarding the notice requirements under the FMLA are not supported by the record. (See Doc. # 19 at 19-21.)  Instead, the undisputed evidence shows that Hunt had access to and acknowledged receipt of Altec's policies and procedures in October 2013. (Jennings Dep. at 47; Exh. 6 to Jennings Dep.)  Additionally, more than 40 days before his termination, Hunt admitted that Jennings explained to him, in detail, the process for applying for FMLA leave through the Hartford and that he understood that process and what he was required to do. (Hunt Dep. at 55, 6-70; Jennings Dep. at 65.)  Hunt testified that he further understood that if he followed those procedures and was approved for FMLA leave, the absences for his son's birth would be covered and he could avoid termination. (Hunt Dep. at 57, 84.)  See Travers v. Cello P'Ship, 579 F. Appx. 409 (6th Cir. 2014); Morel v. Chevron Mining, Inc., 2015-WL 3767144, at *2 (N.D. Ala. June 17, 2015) (Haikala, J.).  As such, the record does not support Plaintiff's argument that Altec interfered with Plaintiff's FMLA rights by failing to provide adequate notice regarding his FMLA rights and duties as required by 29 U.S.C. § 2619.

procedural requirements, absent unusual circumstances:

> An employer may require an employee to comply with
> the employer's usual and customary notice and
> procedural requirements for requesting leave, absent
> unusual circumstances.... An employee ... may be
> required by an employer's policy to contact a specific
> individual. Unusual circumstances would include
> situations such as when an employee is unable to comply
> with the employer's policy that requests for leave should
> be made by contacting a specific number because on the
> day the employee needs to provide notice of his or her
> need for FMLA leave there is no one to answer the call-
> in number and the voice mail box is full. Where an
> employee does not comply with the employer's usual
> notice and procedural requirements, and no unusual
> circumstances justify the failure to comply, FMLA-
> protected leave may be delayed or denied . . . .

29 C.F.R. 825.302(d).   Simply put, if an employee does not comply with an

employer's usual and customary notice and procedural requirements, and there are

no "unusual circumstances," then the FMLA does not give the employee the right

to take leave.  See Cundiff v. Lenawee Stamping Corp., 597 F. Appx. 299, 300

(6th Cir. 2015); Srouder v. Dana Light Axle Mfg.,  LLC, 725 F.3d 608, 614 (6th

Cir. 2013).[12]

The undisputed evidence shows that Hunt did not comply with Altec's usual

and customary requirements for receiving FMLA leave.  As described in detail

above (see infra Section III.A.2), Altec required its employees to contact The

---

12 The court notes that the  Eleventh Circuit has not addressed or relied on this regulation
since it was materially altered in 2009; therefore the court looks to other circuits for guidance.

Hartford and provide all relevant information when they needed to request a leave of absence under the FMLA.  (Jennings Dep. at 52.)  Hunt was aware of Altec's FMLA policy as early as October 2013 when he acknowledged receipt of Altec's policies and procedures, but certainly by March 17, 2014, when Jennings explained, in detail, the procedure for applying for FMLA leave which mandated contacting and being approved by The Hartford.  (Hunt Dep. at 55; Jennings Dep. at 47, 65; Exh. 6 to Jennings Dep.)  Hunt testified that he understood that he was required to call The Hartford and provide all relevant information to be approved for FMLA leave.  (Hunt Dep. at 69-70.)  He also understood that if he was approved for FMLA leave, the final reprimand relating to his absences for the birth of his son, would be removed from his file and he would avoid termination.  (Id. at 84.)

It is undisputed that The Hartford never received any information from Hunt regarding potential FMLA-qualifying leave.  As a result Hunt's absences were not excused under the FMLA, and he was ultimately terminated when he reached nine attendance points under Altec's Attendance Policy.  Hunt understood the policy and he failed to follow it.  Hunt's failure to fulfill his obligations under Altec's procedural requirements to apply for FMLA leave forecloses his ability to bring an FMLA interference claim.  See Brown v. Auto. Components Holding, LLC, 622 F.3d 685, 690 (7th Cir. 2010) (employer was "well within its rights (at least for

17

FMLA purposes) to terminate [plaintiff's] employment according to it standard leave procedures" when plaintiff failed to comply with the notice procedures specified in the CBA for requesting an extension of FMLA leave); Ridings v. Riverside Med. Ctr, 537 F.3d 755, 770-71 (7th Cir. 2008) (affirming summary judgment where the employer's "policies permitted it to terminate [plaintiff] for absenteeism because she did not demonstrate FMLA entitlement; therefore, her termination was not unlawful."); Cundiff, 597 F. Appx at 300 ("If an employee does not comply with [the employer's usual and customary notice and procedural] requirements, then the FMLA does not give him the right to take leave."); see also, Baldwin-Love v. Electronic Data Systems. Corp., 307 F.Supp.2d 1222, 1234-35 (M.D. Ala. 2004) (plaintiff's failure to follow employer's procedures regarding certification of potential FMLA-qualifying leave resulted in those absences not being "unprotected by the FMLA" and employer "did not contravene the FMLA by terminating [plaintiff's] employment on this basis."); Young v. Russell Corp., 2008 WL 5412782, at *2 (M.D. Ala. Dec. 29, 2008) (granting summary judgment on FMLA interference claim where plaintiff "did not submit the medical certification by the extended deadline, therefore [plaintiff's] absences . . . were unexcused, placing [plaintiff] on step 4 of the Attendance Policy, and resulting in [plaintiff's] termination . . . .").

Hunt argues, however, that he and his wife called The Hartford and were

told that Hunt was not in their system.  (E. Hunt Dep. at 17, 19-20, 22-23; Hunt Dep. at 61.)  Hunt further argues that he told Jennings about this issue and she told him that she would look into it and get back to him, but she never did.  (Hunt Dep. at 60; Hunt Decl. ¶ 5.)  Hunt contends that these facts somehow relieve him of his responsibilities under Altec's policy and amount to "unusual circumstances" under the regulations.  (See Doc. # 19 at 18-19.)  The court disagrees.

Regardless of whether The Hartford had record of Hunt or not,[13] the simple, undisputed fact remains that Hunt did not follow the procedures required to obtain FMLA leave.  Hunt testified that by the March 17, 2014 meeting, he fully understood what was required to ensure that his absences for the birth of his child were covered under the FMLA under Altec's policy.  Although he may have begun the process by calling The Hartford and even checking with Jennings regarding his status, it was Hunt's ultimate responsibility to follow Altec's procedures to have his absences qualify as taken under the FMLA.   It was not Jennings's responsibility to "get back with him" or start the process for Hunt.   And the evidence shows that Jennings did check with The Hartford after Hunt told Jennings he was told that he was not in the system, and Jennings was informed, via a screen shot, that Hunt was in The Hartford's system and that he had not initiated any

---

13  Altec submitted documentation that The Hartford did have Hunt in their system at the relevant time period, but regardless of this evidence, the court finds that Hunt did not avail himself of the protections afforded to him under the FMLA for the reasons explained.

leave requests.

Simply put, Hunt did not avail himself of the protections afforded to him under the FMLA. He understood Altec's procedures for applying for FMLA leave, and for whatever reason, he did not complete the requirements.[14] As such, Hunt's interference claim fails as a matter of law.

**B. Retaliation Claim**

To succeed on an FMLA retaliation claim, an employee must demonstrate that the employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right. Strickland, 239 F.3d at 1207. In the absence of direct evidence, the court applies the McDonnell Douglas burden-shifting framework. Id. To establish a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) he engaged in statutorily protected conduct, (2) he suffered an adverse employment action, and (3) there is a causal connection between the protected conduct and the adverse employment action. Id. After the plaintiff establishes a prima facie case, the employer must provide a legitimate, nondiscriminatory reason for the adverse action. Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1243 (11th Cir. 2010). If the employer does so, then the plaintiff has the burden of proving that the reason was merely pretext for

---

14 This circumstance is not unlike the established line of cases where the employee fails to provide adequate certification that an absence qualifies under the FMLA. See, e.g., Cash v. Smith, 231 F.3d 1301, 1307 (11th. Cir. 2000); Ridings, 537 F.3d at 770; Baldwin-Love., 307 F.Supp.2d at 1234-35.

retaliation.  Id. at 1244.  To survive summary judgment, specific facts showing pretext are needed; "[m]ere conclusory allegations and assertions will not suffice." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir.1990).

As explained in detail above, Hunt did not avail himself of the protections of the FMLA because he did not follow Altec's procedures for applying for FMLA leave.  As such, Hunt cannot establish that he engaged in FMLA protected activity. This conclusion is fatal to his retaliation claim, and Altec is entitled to summary judgment as to Hunt's claim of unlawful retaliation in violation of the FMLA.[15]

## V.  Conclusion

For the reasons discussed above, the court finds that no material issues of fact remain and that Defendant is entitled to judgment as a matter of law as to all claims asserted by Plaintiff in the Complaint.  A separate order will be entered.

**DONE** this the___22nd___ day of September, 2015.

_____

SENIOR UNITED STATES DISTRICT JUDGE

---

[15] In the alternative, the court finds that, even if Hunt could establish a prima facie case (which he cannot), Hunt failed to produce any evidence that the reason for his termination was a pretext for retaliation under the FMLA.  Tellingly, Hunt testified that he did "not remember" if Altec retaliated against him.  (Hunt Dep. at 92.)  Instead, the undisputed evidence shows that Jennings made repeated efforts to remind Hunt of his responsibilities under Altec's policy for applying for and receiving leave under the FMLA.  Hunt simply failed to fulfil those responsibilities and was terminated as a result of his violation of the legitimate, nonretaliatory attendance policy.